IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTA FLEMING and DEMETRIOUS FLEMING, husband and wife, | ) ) ) | |
| Plaintiff | ) ) | Case No. 1:19-cv-00113 (Erie) |
| vs. | ) ) ) | RICHARD A. LANZILLO UNITED STATES MAGISTRATE JUDGE |
| PENNSYLVANIA DEPARTMENT OF CORRECTIONS, et al., | ) ) ) ) | MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION TO DISMISS |
| Defendants | ) ) ) | ECF NO. 41 |

This action stems from the destruction of an obituary that was seized by the mailroom supervisor at SCI-Albion under the auspices that it contained contraband and the alleged retaliation that ensued thereafter.  Plaintiffs Christa Fleming and Demetrious Fleming (collectively Plaintiffs) filed the instant civil rights lawsuit, pro se, against seven Pennsylvania Department of Corrections employees — Superintendent Michael Clark, Hearing Examiner Ryan Szelewski, Deputy Superintendent Paul Ennis, Lieutenant Floyd, Mailroom Supervisor Tammy White, Captain Howie Sissem, and Captain Earl Jones (collectively Defendants) — each of whom Plaintiffs sue in their official and individual capacities.  Defendants moved to dismiss Plaintiffs' Third Amended Complaint.[1]  For the reasons that follow, Defendants' motion will be GRANTED, in part, and DENIED, in part.

---

[1] Although Plaintiffs' original complaint named the Pennsylvania Department of Corrections and ten individual defendants, they did not restate their allegations against the Department of Correction or Defendants Meure, Tharp, and Ochs in their Third Amended Complaint.  *See* ECF No. 39.  Thus, those defendants have been dismissed.

I.      Introduction

Plaintiff Demetrious Fleming is a prisoner incarcerated at SCI-Albion.  ECF No. 39.  He and

his wife, Plaintiff Christa Fleming, initiated this civil rights action on April 23, 2019.  ECF No. 1.

Plaintiffs quickly amended and then, sought leave to amend a second time, which this Court granted.

ECF Nos. 11, 15-16.  Defendants thereafter moved to dismiss the second amended complaint (in its

entirety) arguing that Plaintiffs had failed to state a plausible claim under 42 U.S.C. § 1983 for

violations of the First, Fourteenth, and Eighth Amendments of the United States Constitution.

ECF Nos. 22-23.  This Court granted Defendants' motion, in part, and denied it, in part.  The Court

dismissed, with prejudice, all counts with the exception of Count Three, a First Amendment claim

for retaliation.  ECF No. 38.  Plaintiffs were given an opportunity to cure the deficiency in their

pleading of that count.  *Id.*

They filed their Third Amended Complaint on July 14, 2020.  ECF No. 39.  Defendants

again moved to dismiss under FED. R. CIV. P. 12(b)(6), and Plaintiffs responded.  ECF Nos. 41-42,

44.  The matter has been fully briefed and is now ripe for disposition.

II.     Legal Standards

A.      Motion to Dismiss

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal

sufficiency of the complaint.  *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  In deciding a

motion to dismiss, a court is not opining on whether a plaintiff is likely to prevail on the merits;

instead, the plaintiff must only present factual allegations sufficient "to raise a right to relief above

the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L.Ed.2d 929

(2007) (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed.

2004)).  *See also Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009).  A complaint

should only be dismissed under Rule 12(b)(6) if it fails to allege "enough facts to state a claim to

2

relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S. Ct. 1955 (rejecting the traditional

Rule 12(b)(6) standard established in *Conley v. Gibson*, 355 U.S. 41, 78 S. Ct. 99, 2 L.Ed.2d 80 (1957)).

In making this determination, the court must accept as true all well-pleaded factual allegations in the

complaint and views them in a light most favorable to the plaintiff. *U.S. Express Lines, Ltd. v.*

*Higgins*, 281 F.3d 383, 388 (3d Cir. 2002).

    While a complaint does not need detailed factual allegations to survive a motion to dismiss, a

complaint must provide more than labels and conclusions. *Twombly*, 550 U.S. at 555, 127 S. Ct.

1955. A "formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v.*

*Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L.Ed.2d 209 (1986)). Moreover, a court need not

accept inferences drawn by a plaintiff if they are unsupported by the facts in the complaint. *See Cal.*

*Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004) (citing *Morse v. Lower Merion Sch.*

*Dist.*, 132 F.3d 902, 906 (3d Cir. 1997)). Nor must the Court accept legal conclusions disguised as

factual allegations. *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955. *See also McTernan v. City of York, Pa.*,

577 F.3d 521, 531 (3d Cir. 2009).

    Expounding on the *Twombly/Iqbal* line of cases, the Third Circuit has articulated the

following three-step approach:

> First, the court must "tak[e] note of the elements a plaintiff must
> plead to state a claim." Second, the court should identify allegations
> that, "because they are no more than conclusions, are not entitled to
> the assumption of truth." Finally, "where there are well-pleaded
> factual allegations, a court should assume their veracity and then
> determine whether they plausibly give rise to an entitlement for
> relief."

*Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Santiago v. Warminster Twp.*, 629

F.3d 121, 130 (3d Cir. 2010)). This determination is "a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679, 129 S.

Ct. 1937.

B.      Pro Se Pleadings

For purposes of a motion to dismiss, a court must employ less stringent standards in considering pro se pleadings than when judging the work product of an attorney. *Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S. Ct. 594, 30 L.Ed.2d 652 (1972).  When presented with a pro se complaint, the court should construe the complaint liberally and draw fair inferences from what is not alleged as well as from what is alleged. *Dluhos v. Strasberg*, 321 F.3d 365, 369 (3d Cir. 2003).  In a § 1983 action, the court must "apply the applicable law, irrespective of whether a pro se litigant has mentioned it by name." *Higgins v. Beyer*, 293 F.3d 683, 688 (3d Cir. 2002) (quoting *Holley v. Dep't of Veteran Affairs*, 165 F.3d 244, 247-48 (3d Cir. 1999)).  *See also Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996) ("Since this is a § 1983 action, the [pro se] plaintiffs are entitled to relief if their complaint sufficiently alleges deprivation of any right secured by the Constitution").  Despite this liberality, pro se litigants are not relieved of their obligation to allege sufficient facts to support a cognizable legal claim. *See, e.g.*, *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002); *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996).  Finally, the United States Court of Appeals for the Third Circuit in *Phillips v. County of Allegheny* has ruled that if a district court is dismissing a claim under FED. R. CIV. P. 12(b)(6) in a civil rights case, it must sua sponte "permit a curative amendment unless such an amendment would be inequitable or futile."  515 F.3d 224, 245 (3d Cir. 2008).

III.    The Third Amended Complaint

At all relevant times, Mr. Fleming was incarcerated at SCI-Albion.  ECF No. 39 ¶ 5.  In 2018, Mrs. Fleming, mailed a deceased relative's obituary to him. *Id.* ¶¶ 98-99.  The envelope was intercepted by Mail Room Supervisor White. *Id.* ¶ 16.  The obituary was then tested for K2, a synthetic cannabinoid. *Id.*; *see also Shareef v. Moore*, 2020 WL 1445878, at *2 (W.D. Pa. Mar. 25, 2020). Plaintiffs contend that Mail Room Supervisor White "illegally without cause ripped, defamed and destroyed" the obituary. *Id.* ¶ 40.  They further posit that she should have given Mr. Fleming the

opportunity to file a grievance prior to its destruction. *Id.* ¶¶ 39-40, 90-91. Additionally, they aver that Mail Room Supervisor White had no basis for seizing the envelope and initiated the misconduct process "to silence both Plaintiffs" and to prevent them from requesting the "defaced obituary." *Id.* ¶¶ 89-92. In support of their contention that Mr. Fleming would have availed himself of the prison's grievance process, Plaintiffs offer that Mr. Fleming previously filed grievances against Mail Room Supervisor White. *Id.* ¶ 41.

Nonetheless, Special Investigations Lieutenant Floyd prepared a misconduct report at Mail Room Supervisor White's request. *Id.* ¶¶ 42-44. Special Investigations Lieutenant Floyd is the official responsible for making decisions concerning incoming and outgoing mail at SCI-Albion where possible drug or gang related material is found. *Id.* ¶ 30. Plaintiffs aver that the allegations contained in his misconduct report are false and assert that it was only prepared to conceal the unlawful conduct of Mailroom Supervisor White and to prevent Plaintiffs from filing a complaint. *Id.* ¶¶ 44, 95.

Shift Commander Sissem then verified the report. *Id.* ¶¶ 34, 96. Plaintiffs plead that he did so without conducting any independent investigation or determining whether any misconduct had actually occurred. *Id.* ¶ 45. Instead, according to Plaintiffs, he simply verified the report "to cover [up] the injustices of [Special Investigations Lieutenant] Floyd and [Mail Room Supervisor] White" and to "intimidate Mr. and Mrs. Fleming from seeking [their] mail be returned." *Id.* ¶ 96. Plaintiffs aver that Shift Commander Sissem's actions were particularly egregious because "Mr. Fleming had stopped him just hours before in the presence of inmate Shegogg requesting that he help him retrieve his mail." *Id.* ¶ 98.

Misconduct No. B8829664 sets forth the allegations against the Flemings. *Id.* ¶ 46. Plaintiffs represent that it "clearly states that [the] misconduct [was] issued due to Mr. and Mrs. Fleming confirming [that the] mail belong[ed] to them and wanting [the] mail given to Mr. Fleming

or returned to Mrs. Fleming." *Id.* Plaintiffs opine that it would be "highly unlikely" for someone sending or receiving drugs in a prison to request that the seized contraband be returned to the sender or distributed to the inmate. *Id.* ¶ 99.

Immediately thereafter, Superintendent Clark banned Mrs. Fleming from further visitation and "refused to release Mr. Fleming from DC status to AC status." *Id.* ¶¶ 8, 48, 101, 103-04. Plaintiffs allege that prior to making this decision, Superintendent Clark was aware that they were "seeking help from [the Bureau of Internal Investigations,] BII" and he made it clear they were being punished for doing so. *Id.* ¶ 102. (The Third Amended Complaint does not identify precisely when Plaintiffs contacted BII.)

Next, a hearing was scheduled. *See id.* ¶¶ 49, 51. Prior to the hearing, Deputy Superintendent Paul Ennis told Mr. Fleming that he should plan to appeal "because [Deputy Superintendent Ennis] control[ed] the [Program Review Committee,] PRC."[2] *Id.* ¶¶ 49, 110. At the conclusion of the hearing, Hearing Officer Szelewski stated that he believed Mr. Fleming and was aware of the ongoing investigation by BII, yet declared that the prison was not "playing with this type of charge" and that "the powers that be want[ed] to [make] a major statement with these accusations." *Id.* ¶¶ 13, 50-51, 106-07. Plaintiffs assert that "in an attempt to cover [up] the injustices of [Mailroom Supervisor] White, [Special Investigations Lieutenant] Floyd, [Deputy Superintendent] Ennis, and [Shift Commander] Sissem," Hearing Officer Szelewski sanctioned the plaintiffs. *Id.* ¶¶ 52, 105. Mr. Fleming was placed in the Restrictive Housing Unit (RHU) for forty days; lost his skilled job, honors housing privileges, and property (including typewriter); and his prison record was tarnished. *Id.* ¶¶ 47-48, 116. He was also given four urine drug tests (none of

---

[2] Plaintiffs suggest that as the Deputy of Centralized Services, Deputy Superintendent Ennis should not have been involved "in the matter in question at all." *Id.* ¶ 111.

which tested positive).  *Id.* ¶¶ 57, 62, 72, 77-78.  Mrs. Fleming was likewise banned for further

visiting the prison and feared further repercussions.  *Id.* ¶ 117.

Plaintiffs continue that Captain Jones was aware of the pending BII investigation and knew

that Mr. and Mrs. Fleming were only being punished for requesting their mail; yet, he still issued DC

812 Drug Interdiction Policy, which restricted Mrs. Fleming from visiting and likewise suspended

Mr. Fleming's visitation rights.  *Id.* ¶¶ 53, 108.  They also allege that he "had a duty as security

captain to intervene and continue the hearing before sanctions[were] imposed due to BII['s]

investigation."  *Id.* ¶ 109.

On July 10, 2018, Mr. Fleming completed his time in the RHU and was notified that he

would be transferred out.  *Id.* ¶¶ 59-60.  He met with four officers who explained that his grey

footlocker, which contained sentimental photos, mail, and legal materials, was missing.  *Id.* ¶¶ 60-61.

It was never found.  *Id.*  Less than one month later, on August 7, 2018, Chief Hearing Examiner

Moslak recommended that Mr. Fleming's misconduct be vacated, and Executive Deputy Secretary

Tabb Bickell agreed.  *Id.* ¶¶ 64-65, 112.  However, the prison waited two weeks before notifying

Mrs. Fleming.  *Id.* ¶ 66.  Plaintiffs aver that this delay was in retaliation for their contacting BII.  *Id.*

¶¶ 56, 112.

On September 12, 2018, Mr. Fleming, using DC-135A, formally requested that Mrs.

Fleming's visitation privileges be reinstated.  *Id.* ¶ 70.  Despite Superintendent Clark's assurances

that they would be, they were not, but "another inmate in the same situation," Morris, who had not

contacted BII, had his privileges reinstated.  *Id.* ¶¶ 55, 70-71, 113.  On October 18, 2018, Mr.

Fleming asked Deputy Superintendent Ennis why his visitation rights had not been reinstated.  *Id.* ¶

68.  Deputy Superintendent Ennis responded that per the interdiction policy issued by Captain

Jones, Mrs. Fleming was still not permitted to visit.  *Id.* ¶¶ 68-69, 108.

Three weeks later, Mrs. Fleming telephoned Suzann Hobart, Staff Assistant to Executive Deputy Tabb Bickell, inquiring why if Mr. Fleming's misconduct had been vacated, he was still being punished under the prison's Drug Interdiction Policy. *Id.* ¶ 75. Deputy Superintendent Ennis returned her call on December 4, 2018, and during the 25-minute conversation "question[ed] why [she was] making so much noise and [asked] what unanswered questions [did] she have." *Id.* ¶ 76. Later, in their complaint, Plaintiffs allege that this was done "in an attempt to intimidate Mr. and Mrs. Fleming from asking questions and getting answers about mail and visiting privileges." *Id.* ¶ 114.

IV.     Discussion and Analysis[3]

Defendants articulate three reasons why they believe their motion to dismiss should be granted. ECF No. 42. First, Plaintiffs failed to plausibly plead a prima facie case of retaliation. *Id.* Second, Plaintiffs failed to sufficiently allege the personal involvement of Superintendent Clark, Captain Jones, and Deputy Superintendent Ennis. *Id.* Lastly, they assert that they have an absolute defense, i.e., they would have pursued the same disciplinary action in the absence of any protected activity. *Id.* Plaintiffs responded with a brief in opposition. ECF No. 44.

A.     Prima Facie Case of Retaliation and Personal Involvement

The Court will address Defendants first two arguments together. To state a claim for retaliation, Plaintiffs must plead that: (1) they engaged in constitutionally protected conduct; (2) they suffered an adverse action at the hands of prison officials; and (3) the constitutionally protected conduct was a substantial or motivating factor in the decision to take the adverse action. *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016) (citing *Rauser v. Horn*, 241 F.3d 330 (3d Cir. 2001)). "In order to prevail on a § 1983 claim against multiple defendants, a plaintiff must show that each

---

[3] Defendants do no challenge whether Mr. Fleming has exhausted his administrative remedies. *See Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L.Ed.2d 12 (2002).

individual defendant violated his constitutional rights." *Harris v. Pa. Dep't of Corr.*, 2020 WL

1445831, at *3 (W.D. Pa. 2020).  "Personal involvement can be shown through allegations of

personal direction or of actual knowledge and acquiescence.'" *Snider v. Alvarez*, 2020 WL 6395499,

at *16 (M.D. Pa. Nov. 2, 2020) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)); *but

see Perano v. Arbaugh*, 2011 WL 1103885, *7 (E.D.Pa. March 25, 2011) ("In light of the United States

Supreme Court's decision in *Iqbal*, ... which rejected the theory that a supervisor could be liable

based on knowledge of, and acquiescence in, his subordinate's acts, courts have questioned whether

the 'knowledge and acquiescence' standard set out in *Rode* remains good law.") (citing *Bayer v. Monroe

County Children & Youth Services*, 577 F.3d 186, 191 n. 5 (3d Cir.2009); *Ramos-Vazquez v. Primecare

Medical, Inc.*, 2010 U.S. Dist. LEXIS 105867, at *37–39, 2010 WL 3855546, at *10 (E.D. Pa. Sept. 30,

2010).  In any case, such allegations "must be made with appropriate particularity." *Rode*, 845 F.2d

at 1207 (citations omitted).  The Court now turns to the issue of whether Plaintiffs have stated a

prima facie case of retaliation against each of the seven individual defendants.

As Defendants note in their supporting brief, Plaintiffs seem to misunderstand the first

element.  *See* ECF No. 42.  "The First Amendment's Petition Clause protects individuals from

retaliation for filing non-sham lawsuits, grievances, and other petitions directed at the government or

its officials." *Hill v. Barnacle*, 2020 WL 7487996, at *7 (W.D. Pa. Dec. 21, 2020) (internal citation and

quotation omitted); *see Watson v*, 834 F.3d at 422-23 (3d Cir. 2016) (explaining, "Here, the allegedly

retaliatory conduct occurred before he filed his grievance.  However, we do not believe that

chronology necessarily defeats Watson's retaliation claim because he informed prison officials of his

intent to file a grievance and requested an appropriate form from Simosko before any misconduct

was filed against him").  Consequently, the plaintiffs' request for the return of their obituary and the

defendants purported subsequent filing of a false disciplinary charge are not considered protected

activities within the meaning of the First Amendment.  *Williams v. Varano*, 2013 WL 877206, at *7

9

n.8 (M..D. Pa. Mar. 8, 2013) ("The filing of a false disciplinary charge is not a violation unless the

charge was filed in retaliation for the exercise of a constitutional right"). *Cf. Nixon v. Sec'y Pa. Dept. of

Corr.*, 501 Fed. Appx. 176, 178 (3d Cir. 2012) (holding that a single, isolated incident where a

prisoner's mail was confiscated and destroyed prior to an administrative review did not state a claim

for violation of the First Amendment). Rather, they are triggering events, which invited Plaintiffs to

file a non-sham lawsuit, grievance, or other petition.

As already stated, the filing of a grievance is protected activity. *Baez v. Jin*, 2020 WL

1016463, at *11 (W.D. Pa. Jan. 29, 2020). Although there is no definitive case law on the narrow

issue of whether contacting BII is protected activity, Plaintiffs request for BII intervention seems

reasonably analogous to filing a grievance. To this end, Plaintiffs availed themselves of a prison

process to vindicate a right that they believed was being infringed. At this stage in the proceedings,

the Court will assume that this was protected conduct for purposes of their retaliation claim.

Defendants concede the second element in their moving brief. Specifically, Defendants

agree that "some of the actions taken by the Corrections Defendants as alleged herein would qualify

as adverse actions in an appropriate case." ECF No. 42 at 6. *See Dunbar v. Barone*, 487 Fed. Appx.

721, 723 (3d Cir. 2012) (The United States Court of Appeals for the Third Circuit has "held that the

following actions were sufficient to establish adversity: several months in disciplinary confinement;

denial of parole, financial penalties, and transfer to an institution whose distance made regular family

visits impossible; and placement in administrative segregation that severely limited access to the

commissary, library, recreation, and rehabilitative programs"); *see Williams v. Meese*, 926 F.2d 994, 998

(10th Cir. 1991) ("[A prisoner] has no right to a job . . . [but] prison officials cannot punish [him for]

exercising his [F]irst [A]mendment rights by denying him certain job assignments or transferring him

from one job to another"); *Pepe v. Lamas*, 679 Fed. Appx. 173, 175 (3d Cir. 2017) (providing "he

plausibly alleged that he suffered an adverse action when he was not reinstated into his kitchen

10

job"); *Hill*, 2020 WL 7487996, at *8 (explaining "the suspension of . . . visitation privileges constitutes an adverse action").  *See also Cash v. Wetzel*, 8 F. Supp. 3d 644, 659-60 (E.D. Pa. 2014) ("Conduct is adverse action if a factfinder could conclude that the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his rights").

Defendants do challenge whether Plaintiffs have met their burden as to the third element. ECF No. 42 at 6.  It is well-settled that "[t]he mere fact that an adverse action occurs after either a complaint or grievance is filed is relevant, but not dispositive, for the purpose of establishing a causal link between the two events." *Christian v. Garman*, 2019 WL 5450573, at *7 (M.D. Pa. Oct. 24, 2019); *see Lape v. Pa.*, 157 Fed. Appx. 491, 497-98 (3d Cir. 2005).  Only where the facts of a particular case are "unusually suggestive" of a retaliatory  motive should temporal proximity be used to support an inference of causation.  *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997). Plaintiffs can meet their burden by plausibly pleading: "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action or (2) a pattern of antagonism coupled with timing that suggests a causal link." *Christian*, 2019 WL 5450573, at *7 (quoting *Watson*, 834 F.3d at 422).  An unusually suggestive temporal proximity may be found where the adverse action was taken one month after the protected activity.  *See Groins v. Wheeler*, 2018 WL 2192716, at *3 (D.N.J. May 14, 2018).  However, a plaintiff "cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir. 2015).

The allegations against Mail Room Supervisor White, Lieutenant Floyd, and Shift Commander Sissem all stem from actions that caused Plaintiffs to contact BII and thus, preceded any protected activity.  Specifically, Mail Room Supervisor White is alleged to have intentionally destroyed Plaintiffs' relative's obituary, and Lieutenant Floyd and Shift Commander Sissem are

accused of creating a report to hide her misconduct.  ECF No. 39 ¶¶ 34, 40, 42-45, 96.

Consequently, Plaintiffs have failed to state a legally cognizable claim against Mail Room Supervisor

White, Lieutenant Floyd, and Shift Commander Sissem.  *See Gannaway v. Prime Care Med., Inc.*, 150 F.

Supp. 3d 511, 553 (E.D. Pa. Dec. 21, 2015) (providing "Nor has he shown an 'usually suggestive'

proximity in time or 'a pattern of antagonism coupled with timing' between any of his grievances

and the transfers or misconduct charges.  With respect to [p]laintiff's transfer from SCI–Camp Hill

to SCI–Greene, the decision to transfer [p]laintiff was made one day prior to [p]laintiff's filing of his

first and only grievance while at SCI–Camp Hill").

The Court finds, however, at this stage, that Plaintiffs have met their burden as to

Superintendent Clark, Deputy Superintendent Ennis, Hearing Examiner Szelewski, and Captain Earl

Jones.  As to Superintendent Clark, Plaintiffs aver that prior to any hearing, he banned Mrs. Fleming

from visiting the prison and moved Mr. Fleming from "DC status to AC status" despite being told

of the parallel BII investigation.  ECF No. 39 ¶¶ 8, 48, 101, 103-04.  Additionally, they allege that

Superintendent Clark treated Mr. Fleming differently than a similarly situated inmate by not

promptly reinstating Mr. and Mrs. Fleming's visitation rights because of BII's investigation.  *Id.* ¶¶

70-71, 113.  Plaintiffs make a similar allegation against Deputy Superintendent Ennis, i.e., that he

treated Mr. Fleming differently than an otherwise similarly situated inmate by not reinstating

Plaintiffs' visitation rights.  *Id.* ¶¶ 55, 112-13; *see Pepe*, 679 Fed. Appx. at 175 (concluding "[plaintiff]

plausibly alleged that he suffered an adverse action when he was not reinstated into his kitchen

job").  *But see Sears v. McCoy*, 815 Fed. Appx. 668 (3d Cir. 2020) (providing allegations of verbal

harassment, unaccompanied by another injury, are not cognizable under § 1983).  He also promised

Mr. Fleming would be found guilty prior to the hearing.  ECF No. 39 ¶ 110.  Plaintiffs' allegations

are also sufficient to support an inference that Ennis knew of the BII investigation when he acted.

See ECF No. 39, ¶¶ 55, 112.

Concerning Hearing Examiner Szelewski, Plaintiffs aver that despite him knowing that they filed a complaint with BII and finding Mr. Fleming's version of the events credible, Hearing Examiner Szelewski still sentenced him to the RHU for forty days; caused him to lose his skilled job, honors housing privileges, and property (including typewriter); and tarnished his prison record.  *Id.* ¶¶ 13, 47-48, 50-52, 105-07, 116.  As to Captain Jones, Plaintiffs allege he was aware of the pending BII investigation and knew that Mr. and Mrs. Fleming were only being punished for requesting their mail, yet he still issued the DC 812 Drug Interdiction Policy.[4]  *Id.* ¶¶ 53, 108.  For each of these defendants, Plaintiffs have pled an unusually suggestive temporally proximity or a pattern of antagonism.  *See Watson*, 834 F.3d at 424.

For these reasons, Plaintiffs claims against Superintendent Clark, Deputy Superintendent Ennis, Hearing Examiner Szelewski, and Captain Jones will be permitted to move forward to discovery.  There are insufficient allegations to show Mail Room Supervisor White, Lieutenant Floyd, and Shift Commander Sissem were personally involved.  In their responsive brief, Plaintiffs appear to try to overcome this deficiency by alleging a conspiracy.  ECF No. 44.  However, there are insufficient allegations of a conspiracy as well.  To state a claim for conspiracy, Plaintiffs must not only allege an agreement between two or more persons but also identify "specific facts, particular to the moving defendants, demonstrating the actions of defendants committed in creating and furthering the conspiracy, including the times and places of meetings and the general role of each conspirator."  *Brown v. Wetzel*, 2019 WL 1331619, at *6 (W.D. Pa. Mar. 25, 2019) (quoting *Robinson v. Corizon Health, Inc.*, 2016 WL 1274045, *12 (E.D. Pa. Mar. 30, 2016)).  Plaintiffs, in their Third Amended Complaint, failed to do so.

---

[4] The Court acknowledges that Plaintiffs' allegation that Captain Jones "issued DC 812 Drug Interdiction Policy" is unclear.  The Court interprets this as an allegation that he unjustifiably invoked or imposed sanctions under the visitation or drug intervention policy against Plaintiffs as an act of retaliation.

B.      Same Decision Defense

Defendants also argue that their motion to dismiss should be granted because they would

have made the same decision regardless of Plaintiffs' protected activity given that the obituary was

believed to contain a narcotic.  ECF No. 42 at 5-7.  If a prisoner establishes a prima facie case of

retaliation, the burden shifts to prison officials to show, by a preponderance of the evidence, that

"they would have made the same decision absent the protected conduct for reasons reasonably

related to a legitimate penological interest."  *Rauser*, 241 F.3d at 334.  If the prison officials can make

this showing, it defeats the retaliation claim.  *See Carter v. McGrady*, 292 F.3d 152, 159 (3d Cir. 2002)

(stating "even if prison officials were motivated by animus to jailhouse lawyers, Carter's offenses,

such as receiving stolen property, were so clear and overt that we cannot say that the disciplinary

action taken against Carter was retaliatory").  Defendants' argument is premature at the motion to

dismiss stage.  *See Baez*, 2021 WL 816013, at *4.  Defendants may reassert this defense once the

record is more fully developed.  *See id.*

VI.     Conclusion

Given the foregoing, the Defendants' Motion to Dismiss (ECF No. 41) will be granted, in

part, and denied, in part.  The motion to dismiss will granted with respect to Mail Room Supervisor

White, Lieutenant Floyd, and Shift Commander Sissem, and denied with respect to Superintendent

Clark, Hearing Examiner Szelewski, Captain Jones, and Deputy Superintendent Ennis.

An ORDER follows.

**ORDER**

Defendants' Motion to Dismiss (ECF No. 41) is GRANTED, in part, and DENIED, in part.

It is GRANTED with respect to Mail Room Supervisor White, Lieutenant Floyd, and Shift Commander Sissem.  Said individual defendants are DISMISSED, WITH PREJUDICE.

The motion is DENIED, WITHOUT PREJUDICE, to renewal on summary judgment as to Superintendent Clark, Hearing Examiner Szelewski, Captain Jones, and Deputy Superintendent Ennis.

So ORDERED this 17th day of March, 2021.

_____
RICHARD A. LANZILLO
United States Magistrate Judge